IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANGEL M. MATOS LUGO,<br><br>Plaintiff,<br><br>v.<br><br>SOCIEDAD ESPAÑOLA DE AUXILIO MUTUO Y BENEFICENCIA DE PUERTO RICO, et al.,<br><br>Defendants. | CIVIL NO. 20-1314 (CVR) |

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiff Angel M. Matos Lugo ("Plaintiff") brings the present medical malpractice case alleging that Defendants are liable to him under Articles 1802 and 1803[1] of the Puerto Rico Civil Code for the negligent treatment rendered to his late father Mr. Angel M. Matos-Marín ("Mr. Matos") while hospitalized at the Auxilio Mutuo Hospital, which resulted in his death. Defendants are Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico ("Auxilio Mutuo Hospital" or "the hospital"), ER Specialized Care, LLC, Dr. Jessie Girón Morel ("Dr. Girón"), Dr. Gadiel Merced Alvarez ("Dr. Merced"), the Puerto Rico Medical Defense Insurance Company, and the Medical Protective Company ("collectively Defendants").

Before the Court is co-Defendant Dr. Merced's and the Puerto Rico Medical Defense Insurance Company's "Motion for Summary Judgment" and Plaintiff's

---

[1] The Puerto Rico Civil Code was amended in November 2020. The present case was filed, and the actions complained of occurred while the previous Code was still in effect. Therefore, the Court analyzes the issues in this case under the provisions of the old Code. See P.R. Laws Ann., tit. 31 §11720 (2020).

opposition thereto (Docket Nos. 71 and. 82). Co-Defendant ER Specialized Care, LLC, the corporation responsible for operating the emergency room services at the Auxilio Mutuo Hospital, filed a motion to join and adopt by reference all the arguments raised in Dr. Merced's motion and likewise requests summary disposition of this case.[2] (Docket No. 74).

Dr. Merced proffers that the claims against him must be dismissed on three different grounds. First, Plaintiff failed to evidence any deviation of the applicable standard and thus, he cannot establish negligence. Second, Dr. Merced argues there is no causal relation between his limited treatment upon Mr. Matos' initial arrival at the hospital and his ultimate demise eighteen days later. Third, Dr. Merced points to a lack of an indispensable party, as Plaintiff's sister, Yadira Matos Cotto, has not been included as a plaintiff in this case.[3]

Plaintiff's opposition alleges that its expert witness, Dr. Ian Newmark ("Dr. Newmark"), clearly established both the applicable standard of care and a causal link between Dr. Merced's acts and Mr. Matos' demise, both in his deposition testimony as well as in his expert report. As such, Plaintiff urges the Court to deny the motion for summary judgment.

For the reasons explained below, co-Defendant Dr. Merced's "Motion for Summary Judgment" is DENIED.

---

[2] Collectively referred to as "Dr. Merced" for the sake of clarity and for purposes of this Opinion and Order.
[3] Plaintiff filed a Second Amended Complaint to include an inherited claim on behalf of the estate of Plaintiff's recently deceased mother, Aida Iris Lugo-Betancourt. (Docket No. 67). Dr. Merced argued in his Motion for Summary Judgment that an action brought by an estate requires the participation of all its members and the absence of Plaintiff's sister Yadira Matos-Cotto in this case for the inherited claim required the dismissal of the case. Plaintiff recently withdrew the Amended Complaint, and the inherited cause of action as to Plaintiff's mother was dismissed. (Docket Nos. 88 and 89). Therefore, Dr. Merced's argument as a lack of an indispensable party is moot.

## STANDARD

Summary judgment is appropriate if "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (a) and (c). Pursuant to the explicit language of the rule, the moving party must establish this two-fold element. Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed material if it could potentially affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in

numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must then "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c). If they so wish, they may submit a separate statement of facts which they believe are in controversy.

Time and again, the First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is - and what is not - genuinely controverted.'" Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006). Facts which are properly supported "shall be deemed admitted unless properly controverted" and the Court is free to ignore such facts that are not properly supported. Loc. Rule 56(e); Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448 (1st Cir. 2022).

**UNCONTESTED FACTS**

1. Co-Defendant Dr. Merced is a Board certified, emergency medicine physician in the Commonwealth of Puerto Rico who had hospital privileges at co-Defendant Auxilio Mutuo Hospital and was an employee of co-Defendant ER Specialized Care at the time the events that gave rise to this case occurred. (Docket No. 15 at ¶ 9; Docket No. 16 at ¶ 9).

2. Co-Defendant Dr. Girón is a duly licensed internal medicine physician in the Commonwealth of Puerto Rico and had privileges at co-Defendant Auxilio Mutuo Hospital. He was the primary care physician for Mr. Matos for over 10

Case 3:20-cv-01314-CVR   Document 90   Filed 11/27/23   Page 5 of 14

Angel M. Matos Lugo v. Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, et al.
Opinion and Order
Civil No. 20-1314 (CVR)
Page 5
_____

years. (Docket No. 15 at ¶ 8; D. Exhibit 12, p. 42, l. 1-9; p. 76, l. 1-5; p. 78, l. 3-5).

3. Co-Defendant Auxilio Mutuo Hospital is a non-profit corporation organized under the laws of the Commonwealth of Puerto Rico and operates a hospital in San Juan, Puerto Rico. (Docket No. 15 at ¶ 6; Docket No. 19 at ¶ 6).

4. Co-Defendant ER Specialized Care, LLC is a corporation organized under the laws of the Commonwealth of Puerto Rico and operates the emergency room of co-Defendant Auxilio Mutuo Hospital. It provides medical treatment to the general public and provided medical treatment to Mr. Matos for the claims brought in the present case. (Docket No. 15 at ¶ 7; Docket No. 40 at ¶ 7).

5. Co-Defendant the Medical Protective Company is an insurance company authorized to do business in Puerto Rico, that at the time of the facts alleged in the present case, had in full force, and effect an insurance policy in favor of co-Defendant Auxilio Mutuo Hospital. (Docket No. 15 at ¶ 10; Docket No. 27 at ¶ 10).

6. Co-Defendant Puerto Rico Medical Defense Insurance Company is an insurance company authorized to do business in Puerto Rico, that at the time of the facts alleged in the present case, had in full force and effect insurance policies covering co-Defendants Dr. Girón and Dr. Merced. (Docket No. 15 at ¶ 11; Docket No. 16, at ¶ 11; Docket No. 18 at ¶ 11).

7. Plaintiff is the son of the decedent, Mr. Matos. (Docket No. 15 at ¶ 5).

8. Plaintiff is a physician and has been a resident of the island of St. Kitts since January 2016. (D. Exhibit 12, p. 12, l. 2-8).

Case 3:20-cv-01314-CVR   Document 90   Filed 11/27/23   Page 6 of 14

Angel M. Matos Lugo v. Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, et al.
Opinion and Order
Civil No. 20-1314 (CVR)
Page 6
_____

9. When Plaintiff visited Puerto Rico, he would usually stay in a hotel or in a rented apartment. Sometimes he would stay at his parent's house for one or two days if he knew that they were having a family event. (D. Exhibit 12, p. 48, l. 5-18).

10. Mr. Matos was born on January 16, 1951, was retired, and was 68 years old at the time of his death. (D. Exhibit 12, p. 31, l. 20-24; p. 32, l. 1; p. 40, l. 19-22).

11. Plaintiff was aware that his father drank alcohol frequently but does not know if he ever visited an institution to seek help for his drinking habit or if he was ever diagnosed with alcoholism. (D. Exhibit 12, p. 45, l. 15-16; p. 46, l. 18-20; p. 47, l. 13-15).

12. On June 22, 2019, Plaintiff arrived in Puerto Rico and saw his father. He immediately decided to take him to the ER because he saw something was wrong. Plaintiff helped his father get dressed, left his mother in the house with an aunt, and took his father to the Auxilio Mutuo Hospital. (D. Exhibit 12, p. 58, lines 13-23).

13. The medical record indicates that when Mr. Matos arrived at the emergency room on June 22, 2019, his chief complaint was "slurred speech, generalized weakness, dizziness for 5 days ago." He also had dyspnea and an occasional dry cough. (P. Exhibit 2, p. 2).

14. After arriving at the hospital, they went through registration and a triage was done. Mr. Matos responded to the triage nurse's questions. (D. Exhibit 12, p. 59, l. 12-13; p. 65, l. 5-8).

Case 3:20-cv-01314-CVR   Document 90   Filed 11/27/23   Page 7 of 14

Angel M. Matos Lugo v. Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, et al.
Opinion and Order
Civil No. 20-1314 (CVR)
Page 7
_____

15. After triage, Mr. Matos was moved to the unit in charge of chest pain or the respiratory area, where Dr. Merced evaluated him. Dr. Merced ordered several studies, including x-rays and blood work, and called Dr. Girón because he was Mr. Matos' internal medicine doctor and primary care physician. (D. Exhibit 12, p. 59, l. 12-24; p. 60, l. 19-24).

16. Dr. Merced talked to Dr. Girón over the telephone, and then Plaintiff spoke with Dr. Girón. Doctor Girón gave Plaintiff a few recommendations, told him that his father was okay systemically, and believed he had an alcohol withdrawal problem. Dr. Girón recommended Plaintiff to take his father to an alcohol withdrawal service provider to help him with this issue. (D. Exhibit 12, p. 63, l. 10-24).

17. Dr. Girón discussed the case with Dr. Merced over the telephone, including the results of the tests ordered by Dr. Merced. Dr. Girón did not see any clear signs of urinary infection. Dr. Girón and Dr. Merced could not find any reason to keep Mr. Matos hospitalized and discharged him. (D. Exhibit 14, p. 61, l. 1-25; p. 62, l. 1-22).

18. According to Dr. Girón, the decision to discharge the patient was made between him, Dr. Merced, and Plaintiff. (D. Exhibit 14, p. 63, l. 23-25; p. 64, l. 1-6). Dr. Merced agreed with Dr. Girón's clinical judgment to discharge Mr. Matos that day. (P. Exhibit 4, p. 44, l. 1-10).

19. Dr. Merced wrote the discharge order since Dr. Girón was not present at the hospital. (D. Exhibit 11, p. 45, l. 19-22; p. 46, l. 22-24).

20. Mr. Matos was discharged on that same day, June 22, 2019, and went home. Plaintiff did not spend the night at his father's house. (D. Exhibit 12, p. 81, l. 9-16; p. 84, l. 12-17).

21. The following day, June 23, 2019, Mr. Matos was weak and had incontinence. The family members decided to call an ambulance because they thought he needed emergency care. Plaintiff thought that a hospital with a Psychiatric Unit would be better due to Dr. Girón's recommendation the day before, but the ambulance paramedics told him that by law, the hospital was responsible since he had been discharged less than 24 hours before. The ambulance took Mr. Matos back to the Auxilio Mutuo Hospital. (D. Exhibit 12, p. 90, l. 11-18; p. 91, l. 10-24; p. 92, l. 1-6).

22. When they arrived at the emergency room, Mr. Matos was taken directly to the same area he had been at the day before. Dr. Merced was on duty at the emergency room and called Dr. Girón, who arrived less than an hour later. (D. Exhibit 13, p. 9, l. 1-7; p. 23, l. 16-19).

23. After several incidents, Mr. Matos was transferred to the ICU and remained hospitalized at Auxilio Mutuo Hospital until he passed away on July 10, 2019. (D. Exhibit 13, p. 42, l. 15-17; p. 63, l. 11-14).

**LEGAL ANALYSIS**

Puerto Rico substantive law applies in the present case arising in diversity. See Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico, 394 F.3d 40, 43 (1st Cir. 2005) (*citing* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 92, 58 S.Ct. 817 (1938)). Under Puerto Rico law, "[a] person who by an act or omission causes damage to

another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141 (1930). In a medical malpractice suit, a plaintiff must establish, "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortés-Irizarry v. Corp. Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997); Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993).

"Puerto Rico holds health care professionals to a national standard of care." Rojas-Ithier, 394 F.3d at 43. The Puerto Rico Supreme Court has described this standard as "[t]hat [level of care] which, recognizing the modern means of communication and education … meets the professional requirements generally acknowledged by the medical profession." Oliveros v. Abreu, 101 D.P.R. 209, 226 (1973); see also Rolón-Alvarado, 1 F.3d at 77-78 (holding that a health care provider "has a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances"). Therefore, there is a presumption that a physician exercised reasonable care in the treatment of a patient, and for this reason, a plaintiff "ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Cortés-Irizarry, 111 F.3d at 190.

In terms of causation, a Plaintiff must prove by a preponderance of the evidence that the "negligent conduct was the factor that 'most probably' caused the harm to plaintiff." Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 168 (1st Cir. 2005). A factfinder likewise cannot find causation without the assistance of expert testimony to

clarify the complex medical and scientific issues that exist in medical malpractice cases. Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994). In establishing a physician's failure to use the same degree of expertise as could reasonably be expected of a typically competent practitioner under similar circumstances, an expert witness must show more than merely that another doctor would have chosen to treat the patient in a different manner. "The mere fact that [an expert] might have selected a particular approach or method of treatment does not, without more, establish that a different approach or method, even if unsuccessful, fell short of the duty owed." Rolón-Alvarado, 1 F.3d at 78. "Professional standards re[qu]ire normative judgments, not merely proof that a better way to treat a particular patient could have been devised." Id.

Dr. Merced contends, in his request for summary disposition of the claims against him, that Plaintiff failed to present evidence as to the applicable standard of care from which he deviated, beyond Dr. Newmark's opinion. For this reason, he argues Plaintiff failed to establish a causal relation between his limited intervention with Mr. Matos and the latter's passing eighteen days thereafter. Additionally, Dr. Merced proffers that, because of his preexisting conditions, Dr. Newmark admitted Mr. Matos had a 40% to 50% possibility of dying regardless of the treatment rendered to him. Thus, Plaintiff cannot establish the required causal relation element.

In Plaintiff's opposition, he denies that Dr. Newmark did not establish a standard of care or that he only furnished his opinion as to the care provided to Mr. Matos. On the contrary, Plaintiff asserts that Dr. Newmark's report and deposition clearly described both the applicable standard of care and deviation therefrom, as well as a causal link between Dr. Merced's acts and Mr. Matos' demise.

Case 3:20-cv-01314-CVR   Document 90   Filed 11/27/23   Page 11 of 14

Angel M. Matos Lugo v. Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, et al.
Opinion and Order
Civil No. 20-1314 (CVR)
Page 11
_____

The Court gives short shrift to these arguments, as it is evident that there are factual issues that prevent summary disposition of this case. The relevant facts applicable to this motion are few and succinct. The issue boils down to whether Dr. Merced's limited intervention with Mr. Matos on June 22 and 23, 2019 contributed to his ultimate demise.

The record and the uncontested facts show that on June 22, 2019, Plaintiff took his father to the emergency room at the Auxilio Mutuo Hospital. The main complaints were weakness and dizziness, dyspnea, slurred speech, difficulty walking, dry cough, and a history of alcohol dependency. Dr. Merced evaluated Mr. Matos, ordered tests, and called Dr. Girón. Plaintiff also spoke to Dr. Girón, who gave him recommendations to treat what he believed to be an alcohol dependency problem. Both Dr. Matos and Dr. Girón found Mr. Matos fit to be discharged on that same day. The next day, Plaintiff again took his father to the Auxilio Mutuo Hospital's emergency room after Mr. Matos presented weakness and incontinence. Mr. Matos was then formally admitted to the hospital, transferred to the ICU and remained hospitalized until his demise on July 10, 2019.

As is relevant to this particular issue, Dr. Merced admitted in his deposition that he ordered that 1 milligram of Ativan be administered to Mr. Matos. (P. Exhibit 4, p. 71, l. 7-15). In his expert report, Dr. Newmark states as follows: "[d]espite a history of sleep apnea and obesity, and borderline oxygen saturations, he [Mr. Matos] was given a high dose of Ativan in an unmonitored setting and developed acute respiratory failure with significant hypoxia requiring prolonged intubation." (P. Exhibit 10, p. 2). Dr. Newmark further opined that within a reasonable degree of medical certainty,

> it was deviation on the part of the physicians and medical staff of the hospital involved to have prematurely sent Mr. Matos home on June 22, 2019. He had multiple comorbidities and was showing signs and symptoms

of alcohol withdrawal. He was clearly at risk for aspiration, hypoventilation, and other complications including cardiovascular collapse. Furthermore, it was a deviation on the part of the nursing and medical staff to give Mr. Matos high dose benzodiazepines, which led to hypoventilation and respiratory failure..... It is my opinion within a reasonable degree of medication (sic) that the oversedation in an unmonitored setting provided to Mr. Matos led to respiratory failure, as well as multiple other complications which ultimately led to his premature death. Id.

Dr. Newmark additionally stated in his deposition that Mr. Matos should not have been sent home on June 22, 2019. Instead, Mr. Matos should have been admitted on that same day and treated, and had that happened, he does not believe Mr. Matos would have gone on to respiratory failure. (D. Exhibit 16, p. 78, l. 21-24).

There is no doubt that Dr. Newmark discussed both the standard of care and the deviation therefrom, as well as a causal connection between two important events and Mr. Matos' death, to wit, the administration of the Ativan and the early discharge order given on June 22, 2019. Both incidents occurred while Dr. Merced attended to Mr. Matos.[4] No matter how far removed from the date of death, Dr. Newmark directly links the early discharge, as well as the Ativan that Dr. Merced admitted to ordering, with Mr. Matos' ultimate death.

In addition, Dr. Merced argues that this is Dr. Newmark's opinion, and therefore testimony as to what he would have "done differently" is not enough to carry Plaintiff's burden as to the standard of care. However, this Court has previously held that "the minimum standard of acceptable care is almost always a matter of informed opinion,

---

[4] According to Dr. Girón, the decision to discharge Mr. Matos was made by him, Dr. Merced, and Plaintiff. Dr. Merced stated that the decision to discharge was not actually made by him, but admitted he agreed with Dr. Girón's decision to discharge Mr. Matos and signed the release order. Either way, this distinction does not alter the fact that Dr. Merced was involved in Mr. Matos' treatment and early discharge, which in turn, makes this an issue of fact that precludes summary judgment.

which depends on the expert witness' medical knowledge and training." Brady v. Hosp. Hima-San Pablo Bayamón, Civ. No. 07-1085 (ADC), 2010 WL 597421, at \*4 (D.P.R. Feb. 16, 2010). According to Dr. Newmark, Dr. Merced's actions, whether it be by discharging a patient whose condition required admission and/or administering the Ativan, are directly implicated in Mr. Matos' death and necessarily constitute the minimum standard of care. These are clearly matters for the jury to assess as part of its fact-seeking functions and is precisely the kind of factual issue that precludes summary judgment. See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 53 (1st Cir. 2021) (noting that, in deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).

The same reasoning applies to Dr. Merced's argument that Dr. Newmark allegedly testified that, due to Mr. Matos' preexisting conditions and co-morbidities, there was a possibility he would not have survived. As previously stated, Dr. Newmark directly linked Dr. Merced's actions to Mr. Matos' death. How these preexisting conditions may (or may not) have accelerated Mr. Matos' death after the treatment rendered at the Auxilio Mutuo Hospital is, once again, a matter for the medical experts to present at trial and for the jury to determine. Zampierollo-Rheinfeldt, 999 F.3d at 53. It will be the jury's job to evaluate this testimony, compare and contrast Dr. Newmark's opinions against those of

Case 3:20-cv-01314-CVR   Document 90   Filed 11/27/23   Page 14 of 14

Angel M. Matos Lugo v. Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, et al.
Opinion and Order
Civil No. 20-1314 (CVR)
Page 14
_____

Defendants' experts, and come to a conclusion as to causality based on that conflicting testimony.[5]

In sum, the Court finds that there are issues of material fact that prevent summary disposition of the claims brought against co-Defendant Dr. Merced and his insurer.

## CONCLUSION

For the foregoing reasons, the "Motion for Summary Judgment" filed by co-Defendants Dr. Merced and the Puerto Rico Medical Defense Insurance Company is DENIED. (Docket No. 71). ER Specialized Care, LLC's request to join the arguments raised in Docket No. 71 is GRANTED; and the request to dismiss the claims on summary judgment is DENIED. (Docket No. 74).

A Pre-Trial/Settlement Conference will be set via a separate order.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 27th day of November 2023.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE

---

[5] Dr. Angel Rodríguez Quiñones, expert witness for the Auxilio Mutuo Hospital, stated during his deposition that Mr. Matos had symptoms for "a process" that began four or five days before he arrived at the hospital, one of these being a possible infection. (P. Exhibit 9, p. 37, l. 1-18). This testimony further casts doubt on the correctness of the decision to discharge Mr. Matos on June 22, 2019 and is an issue of fact that must be resolved by the jury. This is another reason why summary judgment is not appropriate at this juncture.